UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Denise Dimambro**

     v.                               Case No. 16-cv-486-PB
                                              Opinion No. 2018 DNH 004

**US Social Security Administration,**
**Acting Commissioner**


### MEMORANDUM AND ORDER

Denise Dimambro challenges the partial denial of her claim for Social Security disability income benefits ("SSDI"), pursuant to 42 U.S.C. § 405(g). She contends that the Administrative Law Judge ("ALJ") erred in formulating her residual functional capacity ("RFC") by improperly omitting certain limitations from his assessment and improperly weighing the opinion of her treating physician. The Acting Commissioner, in turn, moves for an order affirming the ALJ's decision. For the reasons that follow, I deny Dimambro's motion and affirm the Commissioner's decision.


## I.   BACKGROUND

Dimambro is a 52 year-old woman, who was 49 years-old on the date of her hearing before the ALJ. Doc. No. 11 at 2. In the past, she has worked as a hostess, receptionist, sales

associate, and manager of a hair salon.  Id.  Most recently, and dating back until 2000, Dimambro worked as a paraprofessional and teacher's aide, which she continued, at least on a part-time basis, until June 2014.  See Administrative Transcript ("Tr.") 19, 29, 220, 263.  She alleges that she has been disabled since November 1, 2013, due to a combination of physical and mental impairments, including certain diseases linked to chronic neck and back pain, depression, anxiety-related disorders, ADHD, and a learning disability.  See Tr. 19, 23.[1]

Following the initial denial of her benefits claim in April 2014, Dimambro requested a hearing before an ALJ, which was held on July 27, 2015.  Tr. 16.  On November 3, 2015, the ALJ issued his decision, concluding that Dimambro was not disabled prior to July 27, 2015, but became disabled on that date due to a change in her age category under 20 C.F.R. § 404.1563.  Tr. 29-31.  On September 30, 2016, the SSA Appeals Council denied her request to review the ALJ's decision, thus making that decision final.  Doc. No. 11 at 2.  Dimambro now appeals.

## II.  **THE ALJ'S DECISION**

---

[1] In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts, (Doc. No. 11). See LR 9.1. Because that joint statement is part of the court's record, I only briefly recount the facts here.  I discuss further facts relevant to the disposition of this matter as necessary below.

The ALJ reached his conclusion after applying the five-step, sequential analysis required by 20 C.F.R. § 404.1520 to Dimambro's claim. At step one, the ALJ found that Dimambro had not engaged in substantial gainful activity since November 1, 2013, her alleged disability onset date, despite some part-time work as a teacher's aide up until June 30, 2014. Tr. 18-19. At step two, the ALJ found that Dimambro had severe impairments of "degenerative disc disease; Graves' hyperthyroidism; fibromyalgia; depression; anxiety-related disorders (variedly diagnosed as a post-traumatic stress disorder and anxiety disorder, nos); an attention deficit hyperactivity disorder, and [a] learning disability." Id. He rejected Dimambro's claim that she suffered from chronic fatigue syndrome and sleep apnea, finding no acceptable medical evidence of those impairments on record. Id. at 20. He did, however, consider the alleged symptoms of sleep disturbance, insomnia, and fatigue in conjunction with her fibromyalgia and depression. Id.

At step three, the ALJ found that none of Dimambro's impairments, individually nor in combination, qualified for any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.; see 20 C.F.R. § 404.1520(d), 404.1525 and 404.1526. Specifically, the ALJ considered Dimambro's spinal, affective, and anxiety-related disorders under the pertinent listings, but ultimately concluded that the evidence of record did not

3

demonstrate the required severity. <u>See</u> Tr. 21-22. In reaching
that conclusion with regards to her mental impairments, the ALJ
thoroughly considered the so called "paragraph B" criteria.[2] The
ALJ also found that Dimambro's mental impairments resulted in
mild restrictions in activities of daily living, mild to
moderate difficulties in social functioning, and moderate
difficulties with regard to concentration, persistence, or pace.
Tr. 21-22. In so concluding, he considered Dimambro's apparent
ability to perform various activities notwithstanding her
impairments, i.e. laundry, driving, shopping, cooking, cleaning,
paying bills, maintaining relationships with her four daughters,
running errands, watching television, reading fiction, and
organizing her affairs. <u>Id.</u>

At step four, the ALJ determined that Dimambro had the RFC
to perform sedentary work, as defined in 20 C.F.R. §
404.1567(a), with certain limitations. Tr. 22. Regarding
physical limitations, the ALJ found that Dimambro was only able
to lift and carry up to ten pounds frequently, and, in an eight-
hour workday, to stand and/or walk for up to two hours in total
and sit for up to six hours in total. <u>See</u> Tr. 22. He further

---

[2] "To satisfy the 'paragraph B' criteria, the mental impairments
must result in at least two of the following: marked restriction
of activities of daily living; marked difficulties in
maintaining social functioning; marked difficulties in
maintaining concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration." Tr. 21.

found that she could perform all postural activities only occasionally, but had unlimited use of her hands and feet to push and/or pull.  Id.  Regarding mental limitations, the ALJ determined that Dimambro was "able to understand, remember, and carry out simple [one-to-three] step tasks for [two]-hour periods over the course of an [eight]-hour workday and 40-hour work week consistent with the performance of unskilled work activity."  Id.  In light of this RFC, the ALJ concluded that Dimambro could not return to her past relevant work as a paraprofessional or teacher's aide.  Tr. 28-29.

Finally, at step five, the ALJ ultimately determined that Dimambro was "not disabled" prior to July 27, 2015, but became disabled on that date due to a change in her age category.[3]  The ALJ first found that, in light of her age prior to July 27, 2015 (i.e. under age 50 or "younger person"), along with her education, work experience, and RFC, Dimambro was capable of performing certain sedentary jobs that existed in significant numbers in the national economy.[4]  See Tr. 30.  Accordingly, the

_____

[3] The ALJ found that as of July 27, 2015, Dimambro was within less than four months of attaining the age of 50.  He also found that "non-mechanical application of the grid rules" was warranted in her case due to "additional vocational adversities." See Tr. 29. Therefore, he treated Dimambro as a "person closely approaching advanced age" (age 50 to 54) as of the hearing date, rather than a "younger person" (under age 50).  See 20 C.F.R. § 404.1563.
[4] Specifically, the representative, sedentary occupations considered by the ALJ included document preparer, monitor, and an addresser.  See Tr. 30.  A vocational expert opined that

5

ALJ found that Dimambro was "not disabled" during that time. Tr. 30. However, he further found that Dimambro's age category changed to "person closely approaching advanced age" on July 27, 2015, as she was by then nearly 50 years-old, and therefore found that Dimambro was "disabled" as of that date. See Tr. 29-30.

### III. STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. See 42 U.S.C. § 405(g). That review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the ALJ's findings of fact, so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)

---

those positions would be suitable to a person of Dimambro's age, education, work experience, and RFC prior to July 27, 2015. Id.

(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. If, however, the ALJ derived her findings by "ignoring evidence, misapplying the law, or judging matters entrusted to experts," her findings are not conclusive. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). The ALJ is responsible for determining issues of credibility, drawing inferences from evidence in the record, and resolving conflicts in the evidence. See Irlanda Ortiz, 955 F.2d at 769.

## IV. ANALYSIS

Dimambro contends that the ALJ's decision was not supported by substantial evidence based on two grounds. First she argues that the ALJ's RFC assessment was deficient because he failed to account for certain functional limitations identified by two consultative psychologists. See Doc. No. 8-1 at 5-9. Second, she argues that the ALJ erred in his physical RFC assessment by giving less than controlling weight to the

opinions of her treating rheumatologist, Dr. Susan Ritter,
without providing "good reasons."[5]  See id. at 9-16.

In response, the Acting Commissioner contends that the
ALJ's decision is supported by substantial evidence and should
be affirmed.  She argues that the limitations identified by
Dimambro as being omitted from the ALJ's mental RFC were all
either appropriately incorporated, rejected, or irrelevant, and
that the ALJ provided "good reasons" for discrediting Dr.
Ritter's opinions.  Doc. No. 10-1 at 1.  I address, and reject
each of Dimambro's arguments in turn.

## A.    Failure to Include Specific Limitations in RFC

Dimambro first claims that the ALJ erred in formulating her
RFC by failing to account for several functional limitations
identified by two consultative experts.  She argues that the
ALJ, as a layperson, was not qualified to disregard

---

[5] To the extent Dimambro makes the same argument regarding the
ALJ's treatment of the opinion of her primary care provider,
Julie Jordan, PA-C, see Doc. No. 8-1 at 9, that argument is
deemed waived.  See Redondo-Borges v. U.S. Dep't of Hous. &
Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) ("Few principles are
more sacrosanct in this circuit than the principle that 'issues
adverted to in a perfunctory manner, unaccompanied by some
effort at developed argumentation, are deemed waived.'") (citing
United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990));
Lawton v. Astrue, 2012 DNH 126, *6.  Aside from a single bare
reference to Jordan's opinion under the argument heading reading
"[t]he ALJ failed to give good reasons for discrediting treating
sources," Dimambro makes no attempt to develop any argument with
regards to the ALJ's treatment of Jordan's opinion.  Rather, her
argument is entirely devoted to the ALJ's specific consideration
of Dr. Ritter's opinions.

"uncontroverted mental health opinions" that apparently stated she could only work in settings with "additional supervision" and other special workplace conditions. See Doc. No. 8-1 at 5. Therefore, she argues, the ALJ's RFC assessment was not supported by substantial evidence without the limitations that predicated the experts' RFC opinions. She makes this argument by pointing to the opinions of two consultative psychologists, Dr. Benjamin Garber and Dr. William Jamieson. Doc. No. 8-1 at 5-7. Both psychologists essentially opined that Dimambro was able to perform "simple" work despite her mental impairments. See Tr. 79 (Dr. Jamieson); Tr. 707 (Dr. Garber). Dimambro does not now challenge the weight given to these opinions, but rather claims that the ALJ either wrongfully rejected or inadequately accounted for several so-called limiting conditions on which the opinions were purportedly predicated. See Doc. No. 8-1 at 5-8.

A claimant's RFC is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The ALJ is responsible for determining a claimant's RFC based on all relevant evidence in the record. 20 C.F.R. § 416.945(a)(1); see Lord v. Apfel, 114 F.Supp.2d 3, 13 (D.N.H.2000); Stephenson v. Halter, 2001 DNH 154, *4-5. In making that determination, she is dually responsible for resolving any conflicts in the evidence. See Gonzalez-Garcia v. Sec'y of Health & Human Servs., 835 F.2d 1, 3 (1st Cir. 1987). The ALJ is further

required to evaluate "every medical opinion" that a claimant submits, "[r]egardless of its source." 20 C.F.R. § 416.927(c). Accordingly, an ALJ must explain in the decision the weight given to any opinions from "treating sources, nontreating sources, and other nonexamining sources." Sastre v. Astrue, 970 F.Supp.2d 267, 275-276 (D. Mass. 2012); see 20 C.F.R. § 416.927(c). Ordinarily, therefore, an ALJ's failure to consider a medical opinion in the record at all is legal error that requires remand. See Nguyen v. Chater, 172 F.3d 31, 35-36 (1st Cir. 1999). This general rule, however, is not without exception. An ALJ need not address every individual piece of evidence in the record that is either cumulative or unhelpful to the claimant's position. See Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D. N.H. 2000). Although an ALJ is not free to simply ignore medical opinions supporting a claimant's position, she remains free to independently evaluate their weight. See Charron v. Astrue, 2013 DNH 156, *5. She can accept each piece of evidence completely, partially, or not at all, provided that she does so on "well-supported grounds." See Molina v. Astrue, 674 F.3d 1104, 1121 (9th Cir. 2012).

1. Dr. Benjamin Garber

On March 19, 2015, Dr. Garber, a licensed psychologist, examined Dimambro and prepared a mental health evaluation report at the request of the New Hampshire Disability Determination

Service ("DDS").  Tr. 703.  In his report, he concluded that
Dimambro suffered from chronic and moderate major depression,
PTSD, ADD, and a learning disability.  Tr. 707.  He assigned her
a "GAF" score of 70.  Id.  As part of his evaluation, Dr. Garber
was required to provide his opinion regarding Dimambro's
"ability to function in terms of appropriateness, independence,
quality and sustainability of function."  Tr. 706.  That process
required Dr. Garber to opine as to the extent of any functional
limitations resulting from Dimambro's impairments, along with
her retained function despite those impairments, in five defined
areas.  Tr. 706-707.  In one of those areas, entitled
"understanding and remembering instructions," Dr. Garber wrote
the following: "[Dimambro] is able to understand and remember
simple spoken and written instructions at least in a minimally
stimulating, highly structured and closely supervised
environment."  Tr. 707 (emphasis added).

In formulating Dimambro's RFC, the ALJ gave Dr. Garber's
opinion substantial weight.  Tr. 28.  To reiterate, the ALJ's
mental RFC provided that "[Dimambro] is able to understand,
remember, and carry out simple ([one-to-three] step) tasks for
[two]-hour periods over the course of an [eight]-hour workday
and 40-hour work week consistent with the performance of
unskilled work activity."  Tr. 22.  However, the ALJ further
found a "lack of evidence to indicate that [Dimambro] would

11

require a minimally stimulating, highly structured and closely supervised environment in order to perform simple [one-to-three] step tasks." Tr. 28. He offered two explanations for that conclusion. See id.

First, the ALJ emphasized the presence of the term "at least" immediately preceding Dr. Garber's description of a suitable "environment." See Tr. 28. He then interpreted that syntax as describing the "minimum amount that [Dimambro] can perform rather than the maximum as assessed pursuant to her [RFC]." Tr. 28. Second, in considering the "record as a whole" particularly Dimambro's own "acknowledged level of activity," the ALJ found nothing indicating that she would require those specific restrictions to perform simple tasks. Tr. 28; see Tr. 21, 25-26 (elaborating on Dimambro's own acknowledged activities).

Dimambro now challenges the ALJ's omission of the underlined portion of Dr. Garber's opinion from his RFC finding at step four. Specifically, she claims that the modifying clause "at least in a minimally stimulating, highly structured and closely supervised environment" was itself a condition upon which Dr. Garber's opinion was predicated. See Doc. No. 8-1 at 5. As such, she argues, it was Dr. Garber's opinion that Dimambro "would need additional supervision." See id. Therefore, in failing to specifically limit Dimambro's RFC to

work in a "closely supervised environment," the ALJ either "ignore[d] medical evidence or substitute[d] his own views for uncontroverted medical opinion." See Doc. No. 8-1 at 5. (The Acting Commissioner does not specifically respond to this first argument.).

I find no error, as the ALJ's treatment of Dr. Garber's opinion is supported by substantial evidence. To start, the ALJ clearly did not "ignore" that portion of Dr. Garber's opinion. He not only quoted it verbatim in his step-four analysis, he explicitly rejected the view that Dimambro's ability to perform simple one-to-three step tasks would depend on her working in a "minimally stimulating, highly structured and closely supervised environment." Tr. 28. Where a medical source opinion can reasonably be read to include a specific functional limitation, an "ALJ is obliged to explain the meaning of the opinion or address it as a limitation." Hafford v. U.S. Soc. Sec. Admin., No. 15-cv-416, 2017 WL 1134716, at *4 (D. N.H. Mar. 27, 2017). Here, despite the qualifying term "at least," Dr. Garber's reference to a "closely supervised environment" can reasonably be read as a limitation;[6] specifically, to his opinion regarding

---

[6] An alternative reading of the ALJ's decision is that he interpreted Dr. Garber's use of the term "at least" to merely *suggest* a "closely supervised environment" rather than to *require* one. Both readings are reasonable interpretations. Although the Acting Commissioner appears to view the ALJ's interpretation of Dr. Garber's opinion as merely "suggest[ing]"

Dimambro's ability "to understand simple spoken and written instructions." Accordingly, the ALJ treated the "closely supervised environment" phrase as a limitation. He then explicitly rejected it and sufficiently explained his basis for doing so.

First, he explained that Dr. Garber's opinion was "noted to assess the minimum amount that the claimant can perform rather than the maximum as assessed pursuant to her [RFC]," emphasizing Dr. Garber's use of the qualifying term "at least." See Tr. 28. It is true that an "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1992). Thus, it was reasonable to reject any limitation as to the "least" of what Dimambro could do as irrelevant to her RFC. See Irlanda Ortiz, 955 F.2d at 769 (the ALJ is responsible for resolving conflicts in the evidence, not the courts).

Second, the ALJ further sufficiently explained that, considering the record as a whole, particularly her own

that Dimambro's "impairments necessitate[] an extra amount or kind of workplace supervision," she has failed to fully develop that argument. Nonetheless, she further contends that the ALJ explicitly rejected that "suggestion," thus acknowledging, at least by implication, that the ALJ treated it as a limitation. The above reading can be deduced based on the prompt to which it was a response, which sought "opinions as to the extent of the claimant's limitations." See Tr. 706-07.

"acknowledged levels of activity," there was a "lack of evidence to indicate that the [Dimambro] would require a minimally stimulating, highly structured and closely supervised environment in order to perform simple [one-to-three] step tasks." Tr. 28. The record contains substantial evidence to support that conclusion. As the ALJ explicitly found, records of Dimambro's own acknowledged level of activity tend to undermine the view that she would necessarily require especially close supervision to perform simple tasks.

Indeed, Dimambro acknowledged "an ongoing ability to perform tasks, such as laundry, driving, and shopping on-line," see Tr. 26, both in her own functional report dated January 2014 and during her examination with Dr. Garber in March 2015. See Tr. 21, 25-26, 230, 231, 705-06. She also "report[ed] an ability to manage her own cooking, cleaning, and errands . . . to provide care for two pets . . . [and] to handle her own money." Tr. 21; see Tr. 25-26. The ALJ specifically discussed those activities and found them consistent with an ability to "understand, remember, and carry out simple [one-to-three) step tasks" without special supervision. Tr. 26, 28. That conclusion was reasonable, and further supported by the medical record. See Johnson v. Colvin, 204 F. Supp. 3d 396, 410 (D. Mass. 2016); see also Rollins v. Massanari, 261 F.3d 853, 856 (1st Cir. 2001) (rejecting restrictions where they "appear[ed]

15

to be inconsistent with the level of activity that [claimant] engaged in by maintaining a household and raising two young children"). For example, Dr. William Jamieson, a non-examining psychological DDS consultant, found that Dimambro's ability to "understand and remember very short and simple instructions" was "not significantly limited," and he did not opine that Dimambro's ability to work depended upon a "closely supervised" work environment.[7] Tr. 77. Therefore, for the reasons discussed, the ALJ's rejection of the "closely supervised" limitation was supported by substantial evidence. See Johnson, 204 F. Supp. 3d at 410.

To the extent Dimambro argues that the ALJ improperly "assess[ed] [the RFC] based on a bare medical record" by rejecting the "closely supervised" limitation without an expert first specifically disavowing it, her argument is misplaced. The bulk of cases she cites are distinguishable in that they all found error where ALJ's utterly ignored, rejected, or discredited uncontroverted medical *diagnoses*, rather than *functional limitations*, without supportive expert opinions. See Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)(ALJ erred in

---

[7] The fact that the ALJ did not cite this portion of Dr. Jamieson's report specifically is of no consequence. As discussed, an ALJ need not cite every individual piece of record evidence that is either cumulative or does not support claimant's position. See Lord, 114 F. Supp. 2d at 13.

rejecting uncontroverted medical opinion that claimant was incapacitated by spinal stenosis); Rose v. Shalala, 34 F.3d 13, 17-18 (1st Cir. 1994)(ALJ erred in finding claimant only had "possible CFS" where "uniform medical opinions" had definitively diagnosed claimant with CFS); Nieves v. Sec'y of Health & Hum. Servs., 775 F.2d 12, 13-14 (1st Cir. 1985)(ALJ erred in discrediting uncontroverted mental I.Q. scores qualifying claimant as mentally disabled under Listing 12.05(c)); Suarez v. Sec'y of Health & Hum. Servs., 740 F.2d 1, 1 (1st Cir. 1984)(per curiam)(ALJ erred in ignoring uncontroverted reports entitling claimant to presumption of disability under 20 C.F.R. Appendix 1, § 12.03 for functional psychotic disorder). The distinction is an important one, because rejecting a medical diagnosis without an expert opinion necessarily requires an ALJ to interpret raw medical data or a bare medical record, which as a layperson an ALJ is unqualified to do. See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996); Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991). By contrast, an ALJ is qualified and generally allowed to "render[ ] commonsense judgments about functional capacity based on medical findings," Gordils v. Sec'y of Health & Hum. Servs., 921 F.2d 327, 329 (1st Cir. 1990), where "the extent of functional loss, and its effect on job performance, would be apparent even to a lay person."

[Santiago v. Sec'y of Health & Human Servs.](), 944 F.2d 1, 7 (1st Cir. 1991) (per curiam).  Here, the ALJ rejected Dr. Garber's "closely supervised" limitation based on a "commonsense judgment" of the record as a whole, rather than an interpretation of raw medical data.  See 21, 25-26, 28. Cf. [Chambers v. Colvin](), 2016 DNH 187, *9 (D. N.H. 2016).  He considered Dimambro's level of activities, as well as the absence of any further evidence indicating that her understanding and memory impairments would require that limitation to perform simple one-to-three step tasks.  See Tr. 28; see [Chambers, 2016 DNH 187]() at *9; [Gordils, 921 F.2d at 329]().[8]

2. Dr. William Jamieson

On April 3, 2014, Dr. Jamieson, a non-examining psychological DDS consultant, provided a mental RFC assessment after reviewing Dimambro's medical records.  Tr. 77-79.  He opined that she experienced moderate limitations in a number of functional areas due to symptoms of anxiety and depression.  Tr.

_____

[8] Additionally, although it may be true that an ALJ errs where he or she "crafts" a functional limitation on her own without pointing to a supportive expert opinion, see [Bubar v. Astrue, No. 11-CV-107, 2011 WL 6937507, at *5-6 (D.N.H. Dec. 5, 2011)](), adopted sub nom. [Bubar v. U.S. Soc. Sec. Admin.](), No. 11-CV-107-JL, 2011 WL 6937476 (D.N.H. Dec. 30, 2011), there is no rule that an ALJ cannot reject a functional limitation without the direct support of an expert opinion.  Because here, the ALJ did not divine any functional limitation that is unsupported by medical opinion, there is no basis for concluding that the ALJ's RFC was "based on his own assessment of the bare medical evidence." [Bubar](), 2011 WL 6937507 at *6.

78-79. Specifically, he found that she was moderately limited in her "ability to understand and remember detailed instructions," and in some of her abilities relating to "sustained concentration and persistence," such as performing activities within a schedule and working with others without distraction. Tr. 77. He further found moderate limitations in her ability to "complete a normal workday" and "perform at a consistent pace," and in her ability to appropriately interact with the public. Tr. 78. He also found her moderately limited in some adaptive abilities, such as "respond[ing] appropriately to changes in the work setting" and "travel[ing] in unfamiliar places." Tr. 78. With all other abilities, including her abilities to "carry out short and simple instructions" and "sustain an ordinary routine without special supervision" he found her to be "not significantly limited." See Tr. 77-78. Finally, Dr. Jamieson's mental RFC assessment provided that:

> [Dimambro] can deal with only short and simple instructions and directions, and limited social demands. However, in a simple job setting, with clear expectations, relatively isolated with few social demands, and reasonably supportive supervision, she could function within reasonable tolerances [regarding] persistence to task. While she would show some disruptions in a normal workday and workweek, these would remain within acceptable tolerances. She has limited stress tolerance, and can deal with only simple and routine changes in the work setting.

Tr. 79 (emphasis added).

The ALJ gave substantial weight to Dr. Jamieson's opinion in formulating Dimambro's RFC. Tr. 28. He took exception, however, to the portion of Dr. Jamieson's opinion limiting Dimambro to a "relatively isolated job setting with few social demands." Id. He determined that "such a limitation would not be warranted" based upon a letter from Dimambro's treating psychologist, Dr. Edward Jacobs, from June 2014. Tr. 28, 736. As the ALJ discussed, Dr. Jacobs had opined that limitation to "such an environment would be detrimental to [Dimambro's] psychological health and could exacerbate her symptoms." Tr. 736; see Tr. 28. The ALJ gave that opinion substantial weight as well, and noted that Dr. Jacobs offered "no further opinion with regard to any additional functional limitations." Tr. 28.

Similar to her first argument, Dimambro now contends that "Dr. Jamieson's opinion was predicated on the work environment being '[i] a simple job setting, [ii] with clear expectations, [iii] relatively isolated with few social demands, and [iv] reasonably supportive supervision.'" Doc. No. 8-1 at 9. Therefore, she argues, the ALJ erred in failing to include those specific limitations in his RFC, and effectively "substitute[ed] his [own] lay view of the evidence" for that of Dr. Jamieson. Doc. No. 8-1 at 8. In other words, Dimambro does not appear to argue that the ALJ ignored Dr. Jamieson's opinion relating to persistence to task, nor that he erred in assigning it

substantial weight.  Rather, she argues that the ALJ erred in
failing to include specific restrictions limiting Dimambro to
work with, *inter alia*, "reasonably supportive supervision,"
without explaining why.[9]  See Doc. 8-1 at 6, 9.

The Acting Commissioner, in response, contends that the
limitations identified by Dr. Jamieson relating to Dimambro's
persistence were either "reflected in the RFC finding, properly
rejected by the ALJ, or irrelevant to the ALJ's decision."  Doc.
No. 10-1 at 8.  She then addresses each of the four restrictions
in turn.  Specifically, she claims that "the ALJ accommodated
Dr. Jamieson's 'simple job setting' limitation by restricting
[Dimambro] to simple tasks," and that the "relatively isolated
with few social demands limitation" was properly rejected.  Doc.
No. 10-1 at 4.  The Acting Commissioner further claims that the
"clear expectations" and "reasonably supportive supervision"
limitations did not warrant explicit inclusion in the ALJ's RFC,
because neither would substantially erode Dimambro's unskilled
job base.  See Doc. No. 10-1 at 4-5.  Nonetheless, she argues

---

[9] Dimambro focuses most of her argument on challenging the
absence of "the reasonably supportive supervision" restriction,
but also emphasizes the "with clear expectations" restriction in
passing.  However, she concludes her argument by arguing that
Dr. Jamieson's opinion was predicated on the work environment
bearing all four characteristics enumerated above.  Doc. 8-1 at
9.  Moreover, the government addresses each of the four
restrictions individually.  Thus, I will assess her argument as
it pertains to all four limitations.

that "reasonably supportive supervision" is implicit in the ALJ's RFC finding because the nature of unskilled work necessarily entails some "reasonably supportive supervision." See id. Finally, the Acting Commissioner argues that to the extent the ALJ did err in omitting the "clear expectations" and "reasonably supportive supervision" limitations from her RFC, the error was harmless. See id.

I agree with the Acting Commissioner, albeit on slightly different grounds, that there is no error here. In short, I find that the ALJ sufficiently explained his rejection of the "relatively isolated with few social demands" restriction, and that his RFC assessment "adequately capture[ed]" the three remaining work-environment restrictions identified by Dr. Jamieson. See Tr. 28.

First, the ALJ adequately explained his decision to reject Dr. Jamieson's requirement[10] that Dimambro work in a "relatively isolated [setting] with few social demands." Tr. 28. As the ALJ explained in his step-four narrative, Dr. Jamieson's opinion

---

[10] The four restrictions enumerated above differ from those previously seen in Dr. Garber's opinion in that they are clearly predicates to Dr. Jamieson's opinion. They specifically modify his opinion that Dimambro can function within reasonable tolerances regarding persistence to task. See Tr. 28. As discussed, Dr. Jamieson had found moderate limitations in Dimambro's abilities to sustain concentration and persistence. See Tr. 77-78. Indeed, the ALJ himself construed the work restrictions as "require[ments]" and "limitation[s]" modifying that opinion. See Tr. 28.

on that point was explicitly refuted by Dr. Jacobs, Dimambro's treating psychologist. See Tr. 28. Dr. Jacobs opined that such a limitation would be detrimental to Dimambro's health and could exacerbate her symptoms. See Tr. 28, 736. Resolving this type of conflict in the evidence is squarely within the role of the ALJ and may not be disturbed absent a compelling reason. See Smith v. Halter, 307 F.3d 377, 379 (1st Cir. 2001); Gonzalez-Garcia, 835 F.2d at 3. Here, the ALJ sufficiently explained his basis for discrediting Dr. Jamieson's opinion on that point in favor of Dr. Jacobs', and his explanation has substantial support in the record. See Duguay v. Colvin, 2014 DNH 207, *4; see also Stanton v. Astrue, 370 Fed. Appx. 231, 234 (2d Cir. 2010) (contradictory reports of other physicians can provide requisite substantial support for rejecting a non-treating medical opinion).

Second, the remaining restrictions identified by Dr. Jamieson relating to Dimambro's functional pace are all adequately reflected in the ALJ's RFC. Determination of a claimant's RFC is an administrative decision reserved for the Commissioner. See 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). As such, the ALJ is entitled to craft an RFC by "piec[ing] together the relevant medical facts from the findings and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144

(1st Cir. 1987); see Huntsberry v. Berryhill, No. 16-cv-929, 2017 WL 2438527, at *9 (N.D. Cal. June 6, 2017). In doing so, the "ALJ is not required to adopt the entirety of" any one physician's opinion on functional capacity. Aho v. Comm. of Soc. Sec. Admin., No. 10-40052, 2011 WL 3511518, at *10 n.8 (D. Mass. Aug. 10, 2011); see 20 C.F.R. 404.1527(d)(2), (f); Bubar, 2011 WL 6937507, at *5; SSR 96-5p, 1996 WL 374183, at *5. "Nor is [he] required to incorporate verbatim" those functional limitations he chooses to adopt. Windsor v. Berryhill, No. 15-cv-391, 2017 WL 1147465, at *4 (M.D. Ala. Mar. 27, 2017); Hescht v. Comm'r of Soc. Sec., No. 4:13-cv-2101, 2015 WL 151169, at *16 (N.D. Ohio Jan. 12, 2015). He is only required to "translat[e] and incorporat[e] [the] clinical findings into a succinct RFC" without overstepping the bounds of lay competence. Rounds v. Comm. Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015); Gordils, 921 F.2d at 329; see Bergeron v. Astrue, 2012 DNH 102, *7.

This is generally accomplished by incorporating concrete restrictions that "capture[] the essence" of, or are consistent with, the limitations identified by experts. Carver v. Colvin, 600 Fed. Appx. 616, 620 (10th Cir. 2015); see, e.g. Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008); see also Bordelor v. Astrue, 281 Fed. Appx. 418, 423 (5th Cir. 2008) (ALJ's RFC "reasonably incorporated" claimant's moderate

limitations in concentration, persistence, and pace by
restricting him "to rare public interaction, low stress, and
simple, one-to-two step instructions"); Windsor, 2017 WL
1147465, at *4 (ALJ's mental RFC assessment that claimant
"should have only occasional changes in work settings and
routines" was "not inconsistent" with physician's opinion that
claimant "should have infrequent changes in her work environment
or expectations"); Delgado v. Colvin, 226 F. Supp. 3d 160, 165
(W.D.N.Y. 2016) (ALJ's RFC assessment that claimant "could
concentrate for up to two hours at a time" was consistent with
examining psychologists opinion that she would have "some
difficulty maintaining attention to concentration over long
periods of time"); Hescht, 2015 WL 151169, at *16 ("range of
light work . . . [with] opportunity for brief, one-to-two minute
changes of position" at fifteen-minute intervals accounted for
consultative physician's finding that she "could only stand and
walk for twenty minutes at a time several times a day").

Here, the ALJ's RFC finding captured the essence of Dr.
Jamieson's opinion regarding Dimambro's moderate persistence
limitations. Nothing required the ALJ to repeat Dr. Jamieson's
limitations verbatim in his RFC finding. He was only required
to adequately account for them, if not reject them. In finding
that Dimambro could only understand, remember, and carry out
simple one-to-three step tasks for two-hour periods over the

course of an eight-hour workday, the ALJ adequately addressed
Dimambro's ability to stay on task.  In so doing, he "captured
the essence" of Dr. Jamieson's conditions that she be limited to
a simple job setting, with clear expectations, and reasonably
supportive supervision.[11]  Simple one-to-three step tasks for two
hour periods are clearly consistent with the more specific
limitations articulated by Dr. Jamieson.

Dimambro's reliance upon MacKenzie v. Colvin, 2016 DNH 034
is misplaced.  In MacKenzie the court held that the ALJ erred in
formulating the claimant's RFC by failing to include a
consultative psychologist's functional limitation that the
claimant only work in an environment with a "non-critical
supervisor."  2016 DNH 034, *4.  That limitation was wrongfully
omitted from the ALJ's RFC assessment that the claimant could
"do unskilled work, in a low stress environment, and with
limited interaction with the public, coworkers, and

---

[11] To the extent Dimambro argues that "reasonably supportive
supervision" is an "important consideration for severity of
symptoms" and therefore warranted express inclusion in her RFC
finding, I am unpersuaded.  See Doc. No. 8-1 at 6-8.  Dimambro's
attempt to equate "reasonably supportive supervision" with
"close or special supervision" is a nonstarter.  The latter is a
condition that, if required, may disqualify persons from
performing certain work under relevant regulations, whereas the
former is a vague and general characteristic inherent to a wide-
variety of jobs.  See Concepcion-Morales v. Comm. of Soc. Sec.,
No. 95-1795, 1996 WL 141786 (1st Cir. 1996)(required "direct
supervision" to perform and complete tasks does not equate to
"close supervision to perform simple unskilled work.").

supervisors." Id.  The psychologist's opinion, which was predicated on the condition that the claimant have a "non-critical supervisor," was the only expert opinion of record that felt claimant could work despite his mental impairments.  Id. Thus, it was the only opinion supporting the ALJ's RFC finding that claimant could perform unskilled work.  Id.  Therefore, the court held that, without the "non-critical supervisor" limitation, the ALJ's RFC was unsupported by the expert's opinion and therefore unsupported by substantial evidence.

MacKenzie is distinguishable from Dimambro's situation, however, because in MacKenzie the ALJ's RFC assessment clearly did not account for the limitation that the claimant work with a "non-critical supervisor."  Limitation to a low-stress work environment with limited interaction with one's supervisor does not adequately account for a non-critical supervisor.  The latter condition is much too specific to be adequately captured by the former.  Here, by contrast, the ALJ's RFC limiting Dimambro to simple one-to-three step tasks for two hour periods is tantamount to work in simple a job setting, with clear expectations, and reasonably supportive supervision.[12]  Nothing

_____

[12] Moreover, Dimambro's challenge is not assisted by the line of cases from other jurisdictions, including Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) and Varga v. Colvin, 794 F.3d 809, 814 (7th Cir. 2015), that have held that an ALJ's own RFC limitation to simple, routine tasks or unskilled work categorically fails to capture moderate limitations in

contemplated by the latter restrictions is lost through imposition of the former.

## B. **Weight Given to Treating Source**

Next, Dimambro challenges the ALJ's decision to give only "limited weight" to the opinions of her treating rheumatologist, Dr. Susan Ritter, which supported an RFC of less than a full range of sedentary work.[13]  She makes several specific critiques

_____

concentration, persistence, or pace.  See Mascio, 780 F.3d at 638; Varga, 794 F.3d at 814; Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011); Ramirez v. Barnhart, 372 F.3d 546, 553-54 (3d Cir. 2004); Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996).  The view underpinning the holdings is that the ability to perform simple tasks differs significantly from the ability to stay on task, and "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."  See Mascio, 780 F.3d at 638.  Therefore, courts have largely agreed that where an ALJ has identified moderate limitations in concentration, persistence, or pace, his RFC finding or hypothetical at step five must either adopt restrictions that address "staying on task" or explain why such restrictions are unwarranted.  See Beyan-Tharpe v. Colvin, 2016 WL 4079532, at *4-7, (M.D. N.C. Jul. 29, 2016).  Here, the ALJ's limitation to simple one-to-three step tasks for two hour periods over the course of an eight-hour workday adequately addresses "staying on task" by reference to the two-hour periods over the course of an eight-hour day; it goes beyond mere limitation to simple, routine, or unskilled work.  See Tenaglia v. Berryhill, No. 16-cv-11796, 2017 WL 4314608, at *5 (D. Mass. Sept. 28, 2017); Guest v. Berryhill, No. 2:16-cv-228, 2017 WL 2414468, at *9-10 (D. Me. June 2, 2017).

[13] Although Dimambro further mentions Julie Jordan, PA-C, also a treating source, under the heading "ALJ failed to give good reasons for discrediting treating sources," she has failed to develop any argument with respect to the ALJ's treatment of those opinions.  Jordan's name appears only once in Dimambro's brief, and she does not even cite to the pages of the ALJ's decision in which Jordan's opinions were discussed.  "[I]t is not the court's job to create and develop arguments to support

of the ALJ's discussion of Dr. Ritter's opinion in support of her claim. For the reasons that follow, I am unpersuaded by Dimambro's argument and find no error.

A "treating source's" opinion is entitled to "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); see Foley v. Astrue, No. 09-10864, 2010 WL 2507773, *8 (D. Mass. June 17, 2010). Even if a treating source's opinion does not satisfy these requirements, "it may be 'entitled to deference.'" Douglas v. Colvin, 2016 DNH 176, *6 (quoting SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). If the ALJ rejects the opinion of a treating source, the ALJ must give "good reasons" for his determination that are "both specific . . . and supportable." Jenness v. Colvin, 2015 DNH 167, *6. Those reasons must "offer a rationale that could be accepted by a reasonable mind." Id. (internal quotes and citations omitted). As long as the ALJ satisfies this standard, I will uphold his decision to discount a treating source's opinion. Costa v. Astrue, 565 F.Supp.2d 265, 271 (D. Mass. 2008).

---

[the claimant's] motion." Lawton v. Astrue, 2012 DNH 126, *6. Thus, any argument with respect to the ALJ's treatment of Julie Jordan's opinions is deemed waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Dimambro appears to take issue primarily with the ALJ's rejection of Dr. Ritter's functional capacity opinions contained in two form questionnaires: an arthritis medical source statement from February 2015, see 872-75, and a fibromyalgia medical source statement from July 2015, see 964-68.[14]  Both opinions portray Dimambro as unable to perform sedentary work, which is contrary to the ALJ's ultimate RFC assessment.  See Tr. 22, 27.  For example, Dr. Ritter's February 2015 report opined that Dimambro could lift and carry less than ten pounds "rarely"; could lift and carry ten pounds "never"; and could stand and/or walk for "less than two hours."  See Tr. 873-75.  In July 2015, she opined that Dimambro could lift and carry less than ten pounds "occasionally"; could lift and carry ten pounds "rarely"; and could stand and/or walk for "less than two hours".  See Tr. 966-67.[15]

---

[14] Dimambro saw Dr. Ritter six times, from November 2013 until December 2014, for management of her joint pain and fibromyalgia.  Doc. No. 11 at 2; Tr. 409, 859-871, 872.  The ALJ discussed treatment notes from several of these visits throughout his step-four narrative as they pertained to Dimambro's neck and back pain.  Tr. 23-24, 27.

[15] These findings are particularly significant because "sedentary work" requires the ability to lift up to ten pounds "occasionally" and to walk and stand "occasionally."  20 C.F.R. § 404.1567(a); Davis v. Shalala, 883 F. Supp. 828, 837 (E.D.N.Y. 1995).  Occasionally is defined as an "activity or condition exist[ing] up to [one-third] of the time," so approximately two hours and forty minutes out of an eight hour workday.  Davis, 883 F.Supp. at 837 (quoting Dictionary of Occupational Titles); SSR 83-10, 1983 WL 31251, at *5.

In assigning "limited weight" to both opinions, the ALJ explained that they were "inconsistent with [Dr. Ritter's] own treatment notes as well as with the evidence of record as a whole." Tr. 27. He elaborated with specific examples from Dr. Ritter's two most recent examinations of Dimambro in November and December 2014 to highlight some inconsistencies.[16] See Tr. 27. The ALJ further explained that the record revealed no evidence of "medically documented findings" consistent with the February and July 2015 assessments. Id. He finally noted that the two opinions were further undermined by evidence of Dimambro's "overall level of activity," as previously discussed, as well as a functional capacity evaluation completed in April 2014 by James Sampson, an examining occupational therapist. See Tr. 25-27, 710-717. The test results indicated that Dimambro could perform a limited range of sedentary work, which entails an ability to lift up to five pounds occasionally, and sit,

---

[16] For example, the ALJ pointed to Dr. Ritter's note from November 2014 that Dimambro's fibromyalgia was benefiting from twice-a-week physical therapy. Tr. 863. He further pointed to Dr. Ritter's note from December 2014 that Dimambro was "well-appearing"; ambulating with a normal gait; and showed "no evidence of synovitis or abnormalities [in her hands with normal] range of motion of the joints in her upper extremities." Tr. 27, 861. Dr. Ritter further noted that Dimambro should stay active, and that she had asked her daughter for yoga classes for Christmas in order to help maintain her physical activity. See Tr. 24, 861. This is sufficiently specific to support the ALJ's finding of inconsistencies between Dr. Ritter's opinions from February and July 2015 and her previous treatment notes dating back to November 2013.

stand and or walk occasionally.  Tr. 25, 716.  However, OT
Sampson concluded that Dimambro's "reports of pain [did] not
match [his] observations," finding suggestions that Dimambro's
reports of pain and disability were not entirely reliable or
accurate.  Tr. 25-26, 715.

I find that the ALJ's decision to assign Dr. Ritter's
opinion limited weight was both supported by substantial
evidence and sufficiently specific under the "good reasons"
standard.  First, the record supports the ALJ's conclusion that
Dr. Ritter's opinion was inconsistent with her own treatment
notes as well as the record as whole.  The ALJ cited specific
examples of those inconsistencies in his decision, such as notes
encouraging Dimambro to remain active.  Tr. 27.  Such internal
inconsistencies provide an acceptable rationale supporting his
decision to assign the opinions only limited weight.  See
Menefee v. Comm'r of Soc. Sec., 995 F. Supp. 2d 820, 833 (N.D.
Ohio 2014) (ALJ's finding that treating source opinion was
"internally unsupported and inconsistent with the record as a
whole" provided "good reason" for assigning it less than
controlling weight); Brown v. Colvin, 2015 DNH 141, *4; Dixon v.
Colvin, No. 2:13-CV-361, 2014 WL 3547378, at *9 (S.D. Ohio July,
17, 2014).  Moreover, the ALJ's conclusion that Dr. Ritter's
opinion was inconsistent with the record as a whole and
unsupported by any "medically documented findings" provides

further good reasons for rejecting her opinion. It appears Dr. Ritter's findings were based substantially on Dimambro's reporting of her own symptoms, and the ALJ found that Dimambro was not fully credible.[17] Tr. 23-24. See Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 877 (6th Cir. 2007). Thus, assigning limited weight to Dr. Ritter's opinions, which were also largely based on Dimambro's reports, was a reasonable decision.

Second, the ALJ further found Dr. Ritter's opinion to be inconsistent with evidence of Dimambro's "ongoing levels of activity" as well as her physical assessment from April 2014. Both of those bases were discussed elsewhere in the ALJ's decision, and were explained with sufficient specificity to support "good reasons." See Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016) (evidence of daily activities inconsistent with

---

[17] To the extent Dimambro argues that the ALJ erred when he noted that, although Dr. Ritter rendered her opinion in July 2015, she had not physically met with Dimambro since December 2014, I am unpersuaded. See Tr. 27. The record supports that characterization of the evidence, and that consideration is relevant in assessing the appropriate weight to assign a treating physician's opinion. See 20 C.F.R. § 404.1527(c)(2)(i); Russell v. Comm'r of Soc. Sec., 440 F. Appx. 163, 164 (4th Cir. 2011). Dimambro is simply incorrect in her claim that the ALJ ignored any role that Dimambro's "financial strain" may have played in that gap in treatment. See Tr. 24 ("[C]laimant reportedly discontinues . . . treatment with . . . Dr. Ritter, due [to] a change in her insurance coverage."). As is she with regards to her claim that the ALJ failed to consider Dr. Ritter's "expertise and treatment relationship" with Dimambro. Both of those factors were plainly considered by the ALJ.

disabling pain can provide "good reasons" for discounting

treating source opinion).  For example, Dimambro's acknowledged

ability to prepare some meals, do laundry, drive, and shop could

all be reasonably viewed as inconsistent with Dr. Ritter's

opinion that Dimambro can never lift ten pounds, or that she can

only stand and walk for less than two hours. See Reece, 834 F.3d

at 910 (claimant's ability to drive combined with other

activities to constitute "good reasons"); Helm v. Comm'r of Soc.

Sec. Admin., 405 Fed. Appx. 997, 1002 (6th Cir. 2011)

(unpublished) (claimant's ability to perform significant

activities around the house constitute "good reasons" for

discounting treating source opinion).  To the extent Dimambro

faults the ALJ for considering her part-time work as an activity

undermining Dr. Ritter's opinion, her argument is misplaced.

"[P]art-time work is an appropriate factor for the ALJ to

consider."  Lopez v. Colvin, 959 F. Supp. 2d 1160, 1171 (8th

Cir. 2013); 20 C.F.R. § 404.1571 ("Even if the work you have

done was not substantial gainful activity, it may show that you

are able to do more work than you actually did.").

    Furthermore, the ALJ's reference to the April 2014 physical

capacity evaluation provides more good reasons.  For example, OT

Samson's finding that Dimambro could "occasionally" stand and/or

walk undermines Dr. Ritter's opinion that she could only stand

and/or walk for less than two hours, as "occasionally"

encompasses a greater period of time.  See SSR 83-10, 1983 WL
31251, at *5 ("'Occasionally' means occurring from very little
up to one-third of the time," or "no more than [two] hours of an
[eight]-hour workday").  Samson's conclusions calling Dimambro's
credibility into doubt further undermine Dr. Ritter's opinion.
As the ALJ discussed, Samson noted several inconsistencies
between Dimambro's own reports of her pain and her actual
functional abilities as observed in the clinical setting.  See
Tr. 26, 710-11, 715.  Such evidence can provide "good reasons"
for rejecting a treating physician's opinion.  See Douglas v.
U.S. Soc. Sec. Admin., 2016 DNH 176, *9 ("An adequately
supported claim of exaggeration can constitute or complement a
'good reason' for rejecting a treating source's opinion.").


## V.  CONCLUSION

For the reasons set forth above, I grant the Acting
Commissioner's motion to affirm (Doc. No. 10), and I deny
Dimambro's motion to reverse and remand (Doc. No. 8).  The clerk
is directed to enter judgment accordingly and close the case.

SO ORDERED.


/s/Paul Barbadoro _____
Paul Barbadoro
United States District Judge

January 5, 2018

cc:  T. David Plourde, Esq.

Daniel Tarabelli, Esq.
D. Lance Tillinghast, Esq.
Laurie Smith Young, Esq.